Filed 8/21/15

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| YVONNE LATTIMORE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>JAMES W. DICKEY III et al.,<br><br>    Defendants and Respondents. | H040126<br>(Monterey County<br>Super. Ct. No. M115880) |

Appellant Yvonne Lattimore brought a wrongful death action against respondents James W. Dickey III, M.D., John R. Carlson, M.D. and Salinas Valley Memorial Healthcare System (Salinas Valley) (hereafter collectively "respondents") arising from their care and treatment of Yvonne's father, decedent Albert Lattimore. The trial court granted respondents' separate motions for summary judgment. Yvonne appeals from the judgments entered against her.

On appeal, Yvonne (appearing in propia persona) argues that the trial court improperly granted respondents' motions for summary judgment as she had presented evidence in opposition to those motions raising a triable issue of fact as to whether respondents' treatment of Albert violated the applicable standards of care.

For the reasons set forth below, we conclude the trial court erred in finding the declaration of Yvonne's medical expert insufficient to raise a triable issue of fact on the issue of the standard of care applicable to physicians and surgeons. However, we also conclude the trial court did not err in finding that Yvonne's medical expert declaration did not raise a triable issue of fact on the standard of care applicable to nurses and hospitals in general. Accordingly, we will reverse the judgment in favor of Dr. Carlson,

whose motion only challenged the standard of care. But we will affirm the judgment in favor of Dr. Dickey, whose motion was based on the additional ground of causation, and we will affirm the judgment in favor of Salinas Valley on the issue of standard of care.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Albert's treatment at Salinas Valley and Yvonne's wrongful death action*

On January 21, 2011, Albert was brought to Salinas Valley for a blood transfusion. He was complaining of pain and weakness. Family members reported that Albert had passed black-colored stools a few days earlier. Albert was 74 years old and had been previously diagnosed with chronic myelomonocytic leukemia.

Dr. Shehzad Aziz examined Albert and assessed him with "[p]ancytopenia secondary to underlying chronic myelomonocytic leukemia, . . . [e]levated serum creatinine[, . . . and] [a]nemia." Albert was admitted to the hospital, and Dr. Aziz planned for him to have nephrology and "GI" consultations.

Dr. Carlson saw Albert later that day for an "[e]valuation of GI bleeding." Albert's stool was black and "guaiac positive." Dr. Carlson was concerned about upper gastrointestinal bleeding and had planned on an "esophagogastroduodenoscopy" (EGD) the following morning, unless Albert's bleeding became profuse that evening.

On January 22, Dr. Carlson performed the EGD after obtaining the informed consent of Yvonne, who held a durable power of attorney for Albert's health care. The procedure revealed a normal esophagus, along with some gastritis, which was biopsied. Inside the duodenal bulb, Dr. Carlson discovered an oozing, cratered ulcer with an adherent clot which he injected with epinephrine before coagulating it for hemostasis. Dr. Carlson reported that the EGD was successful and that Albert "tolerated the procedure well."

On January 23, Albert complained of abdominal pain. A CT scan revealed a retroperitoneal hematoma in and around his duodenum. The report noted that Albert's "case was discussed with Dr. Ray Carrillo and [that] further discussion will be made with

2

family and consultants in [*sic*] this patient who evidently has poor prognosis from other underlying medical conditions, including leukemia."

A second CT scan later that day revealed a large hemorrhagic clot in or around the second portion of the duodenum. Free flowing fluid was also present in the abdomen and pelvis, likely from internal bleeding. Dr. Dickey was consulted and he discussed with Albert's family the possibility of performing an exploratory laparotomy. In that discussion, Dr. Dickey explained the operation, its risks and benefits, as well as possible complications and alternatives to surgery. He advised the family that Albert would possibly need to be admitted to the intensive care unit following surgery, and that he might need to be intubated or put on a ventilator. The family indicated they understood and wanted to proceed with the surgery.

Dr. Dickey subsequently discussed Albert's CT scan with Dr. Giles Duesdieker, a radiologist, and determined that the scan showed evidence that the hematoma was contained. Albert was hemodynamically stable with blood pressure of 140/90 and a pulse of 100. Dr. Dickey decided to cancel the surgery and instead obtain a CT angiogram to determine if there was active bleeding from Albert's gastroduodenal artery. If so, Dr. Dickey would attempt to embolize the site of the bleeding.

According to Dr. Dickey's notes, he again consulted with the family about this decision, explaining the reasons for cancelling the surgery. The family appeared to understand and agree with the decision to "cancel surgery in favor of more diagnostic evaluation."

The next day, January 24, Dr. Carlson performed a second EGD, again after obtaining informed consent from Yvonne. During this procedure, Dr. Carlson found red blood in the middle and lower thirds of Albert's esophagus and in his stomach. He also found an oozing duodenal ulcer with an adherent clot in the duodenal bulb, but he did not disrupt the clot or treat the ulcer by injection or cautery because he was concerned about

3

inducing uncontrollable bleeding. Dr. Carlson recommended coil embolization, an exploratory laparotomy, or comfort care.

Later on January 24, Albert went into cardiac arrest but was resuscitated. He was intubated, put on a ventilator, and transferred to the intensive care unit. While in intensive care, Albert once again went into cardiac arrest. He was again resuscitated, but, per the hospital notes, his family advised staff they did not want any further resuscitative measures taken. Albert subsequently had another cardiac arrest and died at 9:45 p.m.

Yvonne's operative second amended complaint, prepared and filed by her then-counsel, Douglas Malcolm, lists a single cause of action for "wrongful death." In that pleading, Yvonne alleged that "defendants, and each of them, so negligently examined and treated plaintiff's decedent, diagnosed and failed to diagnose his gastrointestinal bleeding, and so negligently treated him and cared for him, and defendants . . . so negligently selected and reviewed its medical staff, that plaintiff's decedent died on January 24, 2011."

B.      *Summary judgment proceedings*

1.      *Dr. Dickey's motion for summary judgment*

Dr. Dickey moved for summary judgment on the grounds that (1) Yvonne could not establish that he breached the applicable standard of care in treating Albert, and (2) any purported breach of the standard of care did not cause or contribute to his death. The motion was supported by, among other things, a declaration from Barry Gardiner, M.D., a general surgeon, and an August 2012 discovery order in which Yvonne was deemed to have admitted that Dr. Dickey's care and treatment of Albert met the applicable standard of care.[1]

---

[1] This discovery order was entered as a sanction for Yvonne's failure to respond to, among other things, Dr. Dickey's requests for admission.

4

Dr. Gardiner's declaration stated that he reviewed the medical records and, in his opinion, Dr. Dickey's decision to cancel the exploratory laparotomy pending further evaluation not only met the standard of care, but was the preferred treatment plan. As to the second ground (causation), Dr. Gardiner opined that any breach of the standard of care by Dr. Dickey did not cause or contribute to Albert's death.

### 2. Dr. Carlson's motion for summary judgment

Dr. Carlson moved for summary judgment on the ground that Yvonne could not establish that he had breached the standard of care applicable to him. His motion was supported by Albert's medical records from Salinas Valley, as well as a declaration from George Triadafilopoulos, M.D., a board-certified gastroenterologist.

In his declaration, Dr. Triadafilopoulos stated that he reviewed the medical records and, in his opinion, Dr. Carlson's care and treatment of Albert complied with the standard of care applicable to gastroenterologists. He specifically noted that the January 22, 2011 endoscopy was appropriate due to the report that Albert had passed black stools and was possibly bleeding in the upper gastrointestinal tract. And he opined that Dr. Carlson's biopsies and injections were appropriate treatment "to achieve hemostasis and ensure there was no gastric infection predisposing to ulcers." As to the January 24, 2011 endoscopy, Dr. Triadafilopoulos stated that "Dr. Carlson's decision to not disrupt or treat the ulcer was appropriate, as, in the context of a large retroperitoneal hematoma, any further treatment could have induced uncontrollable bleeding and made the situation worse."

### 3. Salinas Valley's motion for summary judgment

Salinas Valley moved for summary judgment on the ground that Yvonne could not establish that it had breached the standard of care applicable to it. In support of its motion, Salinas Valley presented Albert's medical records, as well as the declaration of Dorothy A. Dennin, R.N. Dennin was certified as a critical care registered nurse in 1989 and has been employed as a trauma intensive care registered nurse and staff nurse at John

5

Muir Medical Center since 1989. Dennin also served as a trauma nurse in the United States Air Force for 10 years both on active duty and as part of the reserve.

In her declaration, Dennin stated she is "experienced with the pre and post-operative care for patients undergoing endoscopic procedures," and is "familiar with the standard of care applicable to hospitals and hospital employees." After reviewing Albert's medical records, Dennin opined that Salinas Valley's employees "complied with the standard of care" in treating him. Specifically, "[t]hey monitored [Albert]'s vitals in a timely fashion and properly responded to his complaints of pain. . . . They appropriately communicated with his treating physicians, apprising them of lab values, vitals and pain following the patient's endoscopy. They responded appropriately to arguments among the patient's visitors/family. The nurses attending to [Albert] administered medication and performed follow up assessments all in accordance with the standard of care. They responded appropriately before, during, and after his code blues."

### 4. *Yvonne's oppositions to the three motions*

In her separate oppositions to respondents' motions, Yvonne presented the declaration of Warren Duke Turner, M.D., who stated he is board-certified in family medicine and emergency medicine. Dr. Turner was also Albert's primary physician. In his declaration, Dr. Turner stated it was his opinion that "surgery and/or an intervention procedure should have been performed immediately once the providers were aware of decedent's critical blood loss condition," and that such intervention or surgery would have given Albert "a chance of survival."

### 5. *Trial court's ruling on the motions*

The trial court granted the three motions for summary judgment. In its order granting Dr. Carlson's motion, the trial court found Dr. Turner was not competent to testify about the standard of care applicable to gastroenterologists. Thus, the trial court concluded, Yvonne had failed to present evidence creating a triable issue of fact on that element of her cause of action.

6

As to Dr. Dickey, the trial court similarly found Dr. Turner was not competent to testify as to the standard of care applicable to general surgeons; thus, there was no triable issue of fact on the breach of that standard. In addition, the trial court ruled Dr. Dickey was entitled to summary judgment on two other grounds: (1) Yvonne failed to present evidence raising a triable issue of material fact on the element of causation; and (2) Yvonne was bound by her admissions, per the August 2012 discovery order, that Dr. Dickey had met the applicable standard of care in his treatment of Albert.

The order granting Salinas Valley's motion for summary judgment did not mention Dr. Turner's declaration. Instead, the trial court found no triable issues of material fact, ruling that Salinas Valley "complied with the standard of care, and [] no negligent act or omission on its behalf was the legal cause of [Albert]'s death."

Judgments were entered in respondents' favor. Yvonne timely appealed.[2]

## II. DISCUSSION

### A. *Standard of review*

To prevail on a motion for summary judgment, a defendant must show that one or more elements of the plaintiff's cause of action cannot be established or that there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (p)(2).) "A court may grant summary judgment only when the evidence in support of the moving party establishes that there is no issue of fact to be tried." (*Neighbarger v. Irwin Industries, Inc.* (1994) 8 Cal.4th 532, 547.) In other words, summary judgment should be

---

[2] Dr. Dickey's opening brief notes that Yvonne's notice of appeal was actually premature as it was filed before entry of judgment. He does not object to the appeal on this ground, but raises the point only to explain why the clerk's transcript does not contain a copy of the judgment in his favor. It is within our discretion to treat an appeal from a nonappealable order granting a motion for summary judgment as an appeal from the subsequent judgment, and we will do so here. (Cal. Rules of Court, rule 8.104(d)(2)); *Mukthar v. Latin American Security Service* (2006) 139 Cal.App.4th 284, 288.)

7

granted only when a moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

On an appeal from summary judgment, we review the record de novo. (See *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.) "We need not defer to the trial court and are not bound by the reasons for [its] summary judgment ruling; we review the ruling of the trial court, not its rationale." (*Knapp v. Doherty* (2004) 123 Cal.App.4th 76, 85.)

Because a motion for summary judgment raises only questions of law, we independently review the parties' supporting and opposing papers and apply the same standard as the trial court to determine whether a triable issue of material fact exists. (*City of San Diego v. U.S. Gypsum Co.* (1994) 30 Cal.App.4th 575, 582.) When reviewing an order granting summary judgment or summary adjudication, we apply the same three-step analysis as the trial court. (*Inter Mountain Mortgage, Inc. v. Sulimen* (2000) 78 Cal.App.4th 1434, 1439.) "First, we identify the issues framed by the pleadings. Next, we determine whether the moving party has established facts justifying judgment in its favor. Finally, if the moving party has carried its initial burden, we decide whether the opposing party has demonstrated the existence of a triable, material fact issue." (*Chavez v. Carpenter* (2001) 91 Cal.App.4th 1433, 1438.)

We consider all of the competent evidence presented by the parties (declarations, judicial admissions, responses to discovery, deposition testimony, and items of which judicial notice may be taken) and the uncontradicted inferences supported by the evidence. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.) "We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037 (*Yanowitz*).) However, triable issues of fact can only be created by conflicting evidence, not speculation or conjecture. (*Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 807.) We do not weigh the evidence and inferences, but merely determine whether a reasonable trier of fact could find in

favor of the party opposing the motion, and must deny the motion when there is some evidence that, if believed, would support judgment in favor of the nonmoving party. (*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 139.) Finally, we resolve any doubt as to the granting of the motion in favor of the opposing party. (*Renna v. County of Fresno* (2000) 78 Cal.App.4th 1, 5.)

### B.  Issues framed by pleadings

Yvonne's second amended complaint, the operative pleading in this case, sets forth a single cause of action for wrongful death.

"A cause of action for wrongful death is . . . a statutory claim.  (Code Civ. Proc., §§ 377.60-377.62.)  Its purpose is to compensate specified persons—heirs—for the loss of companionship and for other losses suffered as a result of a decedent's death." (*Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256, 1263.)  " 'The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the *pecuniary loss* suffered by the *heirs*.' " (*Ibid.*, original italics.)

In this case, Yvonne alleged that the underlying tort which resulted in Albert's wrongful death was respondents' professional negligence, i.e., medical malpractice. "The elements of a cause of action for medical malpractice are:  (1) a duty to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) a breach of the duty; (3) a proximate causal connection between the negligent conduct and the injury; and (4) resulting loss or damage." (*Johnson v. Superior Court* (2006) 143 Cal.App.4th 297, 305 (*Johnson*).)  The first element, standard of care, is the key issue in a malpractice action and can only be proved by expert testimony, unless the circumstances are such that the required conduct is within the layperson's

9

common knowledge.[3]  (*Landeros v. Flood* (1976) 17 Cal.3d 399, 410; *Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 1001.)  In those cases where a medical specialist is alleged to have acted negligently, the "specialist must possess and use the learning, care and skill normally possessed and exercised by practitioners of that specialty under the same or similar circumstances." (*Carmichael v. Reitz* (1971) 17 Cal.App.3d 958, 976.)  Accordingly, as to Drs. Dickey and Carlson, they had a duty to use the skill, prudence, and diligence commonly possessed and exercised by, respectively, gastroenterologists and general surgeons.

As for Salinas Valley, "[i]t is also established that a nurse's conduct must not be measured by the standard of care required of a physician or surgeon, but by that of other nurses in the same or similar locality and under similar circumstances." (*Alef v. Alta Bates Hospital* (1992) 5 Cal.App.4th 208, 215.)  Just as with physicians and surgeons, however, "expert opinion testimony is required to prove that a defendant nurse did not meet the standard of care and therefore was negligent, 'except in cases where the negligence is obvious to [laypersons].' " (*Massey v. Mercy Medical Center Redding* (2009) 180 Cal.App.4th 690, 694-695, quoting *Kelley v. Trunk* (1998) 66 Cal.App.4th 519, 523.)

---

[3] This " 'common knowledge' " exception is "principally limited to situations in which the plaintiff can invoke the doctrine of res ipsa loquitur, i.e., when a layperson 'is able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised.' " (*Flowers v. Torrance Memorial Hospital Medical Center*, *supra*, 8 Cal.4th at p. 1001.)  The "classic example" is an instrument left in a patient's body after surgery.  (*Ibid*.)  Yvonne does not argue that this exception applies to respondents' care and treatment of Albert, and properly so.  The factors to be considered in making a decision to either proceed with surgery on a 74-year-old man with chronic leukemia or await the results of further diagnostics, for example, are well outside a layperson's common knowledge.

### C. *Evidence relating to the applicable standard of care*

As discussed above, each of respondents' motions were supported by declarations from qualified experts in their particular fields (i.e. gastroenterology, general surgery, nursing, etc.). In those declarations, the experts stated they had reviewed Albert's medical records and other materials and they briefly summarized Albert's treatment at Salinas Valley before concluding that the applicable standard of care was met. This evidence was sufficient to meet respondents' initial burden on this essential element of Yvonne's wrongful death claim. It was therefore incumbent on Yvonne to produce expert evidence raising a triable issue of fact on the standard of care issue.

Under Evidence Code section 720, subdivision (a), a person is qualified to testify as an expert if he or she "has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." "[T]he determinative issue in each case must be whether the witness has sufficient skill or experience in the field so that his testimony would be likely to assist the jury in the search for the truth . . . . [Citation.] Where a witness has disclosed sufficient knowledge, the question of the degree of knowledge goes more to the weight of the evidence than its admissibility. [Citation.]" (*Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 38.)

Yvonne's expert, Dr. Turner, declared he is board-certified in "family medicine" and "emergency medicine." The trial court found these qualifications were insufficient and, thus, it determined Dr. Turner was not "competent" to opine on the standard of care in this case. This was error.

On summary judgment, the trial court—and this court—must "liberally construe the evidence in support of the party opposing summary judgment" (*Yanowitz*, *supra*, 36 Cal.4th at p. 1037.) Although Dr. Turner does not disclose any specific training or experience as a gastroenterologist or a general surgeon, his qualifications in emergency medicine, liberally construed, suffice to demonstrate skill and experience in treating patients who may be experiencing internal bleeding or are otherwise in need of

11

immediate treatment. Whether his knowledge in these areas would be sufficient to convince a trier of fact is irrelevant at this stage of the proceedings. Accordingly, Dr. Turner's declaration was sufficient to raise a triable issue of fact as to whether there was any deviation from the standards of care attributable to Drs. Dickey and Carlson. The trial court erred in finding that Dr. Turner was not competent to offer such testimony. Therefore, neither Dr. Dickey nor Dr. Carlson established he was entitled to entry of judgment in his favor on *this* element of the tort of professional negligence. Since this was the *only* ground on which Dr. Carlson moved for summary judgment, it was improper for the trial court to grant his motion, and judgment in his favor must be reversed.[4]

However, turning to Salinas Valley, even if we liberally construe Dr. Turner's declaration, it does not indicate that he possesses *any* certification, expertise or relevant knowledge of the standards of care attributable to nurses, hospitals or hospital employees, other than physicians or surgeons. As a result, Yvonne failed to present evidence which raised a triable issue of fact as to Salinas Valley's standard of care, and the trial court properly granted Salinas Valley's motion for summary judgment.

D.      *Dr. Dickey's motion was properly granted*

Notwithstanding the trial court's error in finding Dr. Turner not competent to opine on the standard of care applicable to a general surgeon, Dr. Dickey's motion for summary judgment was based on two additional grounds: (1) the element of causation; and (2) the August 2012 discovery order. The trial court found both of these grounds supported entry of judgment in his favor. On appeal, Yvonne does not directly address either of these alternative bases for granting Dr. Dickey's motion. We agree with the trial court that Dr. Dickey was entitled to summary judgment on either ground.

_____

[4] Dr. Dickey's motion for summary judgment was granted on two further grounds, which we discuss in more detail below.

12

As discussed above, one of the essential elements of a cause of action for medical malpractice is "a proximate causal connection between the negligent conduct and the injury." (*Johnson*, *supra*, 143 Cal.App.4th at p. 305.) "The law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case." (*Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402 (*Jones*).)

In support of his motion, Dr. Dickey presented the declaration of Dr. Gardiner who reviewed Albert's medical records and concluded that any breach of the standard of care by Dr. Dickey neither caused nor contributed to Albert's death. In opposition, Dr. Turner's declaration stated only that timely intervention or surgery would have given Albert "a chance of survival." This declaration is insufficient to raise a triable issue of fact on the element of causation: "a chance" does not amount to a reasonable medical probability. (*Jones*, *supra*, 163 Cal.App.3d at p. 402.)

And, even if Dr. Turner's declaration could be construed to raise a triable issue of fact on the element of causation, the trial court properly granted Dr. Dickey's motion for summary judgment based on the August 2012 discovery order. Under the terms of that order, Yvonne was deemed to have admitted that Dr. Dickey's care and treatment of Albert met the applicable standard of care. There is nothing in the record to show that Yvonne made any attempt in the trial court to withdraw or amend these deemed admissions. (See Code of Civ. Proc., § 2033, subd. (m) [setting forth procedure and criteria for party to withdraw or amend admission].) "[A] deemed admitted order establishes, by judicial fiat, that a nonresponding party has responded to the requests by admitting the truth of all matters contained therein." (*Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 979.)

## III. DISPOSITION

The judgments in favor of Dr. Dickey and Salinas Valley are affirmed.

13

The judgment in favor of Dr. Carlson is reversed. The superior court is directed to vacate its order granting Dr. Carlson's motion for summary judgment and enter a new order denying that motion.

The parties shall bear their own costs on appeal.

_____

Márquez, J.

WE CONCUR:


_____

Rushing, P.J.


_____

Elia, J.


Lattimore v. Dickey et al.
H040126

| | |
|---|---|
| Trial Court: | Monterey County Superior Court<br>Superior Court No.: M115880 |
| Trial Judge: | The Honorable<br>Lydia Villarreal |
| Attorney for Plaintiff and Appellant<br>Yvonne Lattimore: | In pro per |
| Attorneys for Defendant and Respondent<br>James W. Dickey III, M.D.: | Oium Reyen & Pryor<br>Virgil Pryor<br>Bret R. Landess |
| Attorneys for Defendant and Respondent<br>John R. Carlson, M.D.: | Hassard Bonnington LLP<br>B. Thomas French<br>Joseph C. Gharrity |
| Attorneys for Defendant and Respondent<br>Salinas Valley Memorial Healthcare<br>System: | Donnelly Nelson Depolo & Murray<br>David A. Depolo<br>Sonja M. Dahl |

Lattimore v. Dickey et. al.
H040126